# United States Court of Appeals
## For the First Circuit

No. 00-2305

ROBERT E. FORTINI, III,

Petitioner, Appellant,

v.

PAUL B. MURPHY,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Boudin, Chief Judge,

Lynch and Lipez, Circuit Judges.

Robert L. Sheketoff with whom Sheketoff & Homan was on brief
for petitioner.
Thomas W. Dee, Assistant Attorney General, Criminal Bureau,
with whom Thomas F. Reilly, Attorney General, was on brief for
respondent.

July 27, 2001

BOUDIN, Chief Judge. This is an appeal by Robert Fortini from a federal district court order dismissing Fortini's petition for a writ of habeas corpus. Fortini is currently serving a life sentence, having been convicted in state court of second degree murder. Fortini's claim depends critically on the facts of the case which we describe in some detail, identifying the few significant details that were disputed.

In 1992, Fortini lived in a second-floor apartment with his girlfriend, Jacie Hall, and her cousin, Tammy Peckham, in Plymouth, Massachusetts. Between 5 p.m. and 9 p.m. on June 22, Ceasar Monterio--Fortini's eventual victim--came to the apartment on at least three occasions looking for Peckham. On one occasion Fortini went downstairs and told Monterio that Peckham was not at home. Shortly after Monterio's last appearance, Hall heard the occupants of a car shouting profanities as the vehicle drove past the house and she told Fortini about the incident.

After spending the evening watching television and cleaning his shotgun, Fortini went to bed at 11:30 p.m. At 11:50 p.m., he was awoken by a car horn and a male voice, screaming curses and racial epithets towards the house (Fortini is white; Monterio was black). Fortini got out of bed, got

dressed and proceeded down to the his first-floor front porch.[1] After sitting on the porch for a period, he returned to his apartment and, at 12:48 a.m., called the police to report the earlier disturbance. The police did not dispatch officers to the house, but the dispatcher told Fortini that if he got a license "plate or something . . . [the police could] check them out."

Fortini then retrieved his shotgun and ammunition and returned to his seat on the downstairs porch. Although the steps to the second floor were lighted, the porch was not. At approximately 1:15 a.m., Monterio and a friend (Dana Lopes) returned to the house. According to Fortini, he heard two sets of footsteps and a whispered conversation. He then heard a voice say, "watch this shit, we're going to wake some motherfuckers up." Shortly thereafter, he saw someone (who proved to be Monterio) start up the stairs moving rapidly to the porch.

As Monterio reached the porch, Fortini stood up and took a couple of steps forward towards the porch steps with the

---

[1]There is some uncertainty as to whether Fortini had the shotgun when he first went down to the porch or took it down only after he called the police. Compare Commonwealth v. Fortini, 692 N.E.2d 110, 111 (Mass. App. Ct. 1998), with id. at 112. The trial transcript suggests that he went down with the shotgun after he called the police.

-3-

shotgun in his hands.  According to Fortini, he then yelled "hey, get the fuck out of here" to the person on the porch.[2]  In response, Fortini said that Monterio stared at Fortini and the gun, centered his attention on the gun, and then lunged towards Fortini and the weapon.  Fortini took one step backwards and fired, striking Monterio in the chest and killing him almost instantly.

Fortini was charged with murder in Massachusetts Superior Court.  In pretrial proceedings, Fortini argued that he believed Monterio was attempting to take the gun away from him and that he shot Monterio in self defense.  In support of this theory, Fortini filed a motion in limine asking to introduce evidence of Monterio's acts only five to seven minutes before he stepped onto Fortini's porch and was killed.  The evidence that Fortini wanted to offer was this:

According to witnesses, shortly before Monterio arrived at Fortini's house, Monterio ran onto a basketball court where four white males were playing night basketball.  Monterio then struck, or attempted to strike, all four men.  After his

_____

[2]Whether Fortini said anything before shooting Monterio is not certain:  Monterio's companion (Lopes) said that Fortini did not say anything; Fortini's girlfriend (Hall) said that she did not hear anything before the gunshot, but she also testified that she was asleep at the time.  By contrast, Fortini's next door neighbor testified that she heard Fortini yelling before the gunshot.

companion (Lopes) pulled him away, Monterio yelled, "I'll kill them all. Remember my face, I'm Ceasar Monterio. I'm the baddest motherfucker in town." Immediately after the confrontation, Monterio and Lopes walked towards Fortini's house. On the way, a police officer heard Monterio again yell, "I'm bad. I'm the baddest motherfucker in the world." Monterio arrived at Fortini's house a few minutes later.

In his pretrial motion, Fortini argued that the evidence of this episode was admissible because the fight and the shooting had a "temporal and schematic nexus," and that the evidence--by showing that Monterio had been violent that night and was acting in "hot blood"--supported in various ways Fortini's claim of self defense.[3] Rejecting these grounds for admission, the trial court excluded the evidence in a pretrial ruling, finding that Fortini was not at the time of the shooting aware of Monterio's actions on the basketball court (a point that Fortini did not dispute), see Commonwealth v. Fontes, 488 N.E.2d 760, 762-63 (Mass. 1986), and that Fortini was not the

---

[3]The defense argued that Monterio's actions and statements were relevant in three ways. First, that they illustrated a "continuous pattern of illicit activity and aggression" by Monterio toward Fortini. Second, that Monterio's "present anger or 'hot blood'" should be a factor in determining whether Fortini's use of force was reasonable. Third, that Monterio's unprovoked attack on the four white basketball players illustrated his "hostility toward members of [Fortini's] race."

subject of Monterio's threats, see Commonwealth v. Rubin, 63 N.E.2d 344, 345-46 (Mass. 1945). After a seven-day jury trial, Fortini was convicted of second degree murder and given the mandatory sentence of life in prison.

Fortini appealed to the Massachusetts Appeals Court, arguing for the first time that the decision not to admit the disputed evidence was not only error under state law but violated the federal constitution as well. In his brief, Fortini stated that the evidence was "relevant, trustworthy, and critical to the defendant's defense," that its exclusion was inconsistent with Chambers v. Mississippi, 410 U.S. 284, 303 (1973), and therefore that his constitutional right to due process had been violated. In its appellate brief, the Commonwealth argued that the trial court's ruling was correct as a matter of evidence law, but it did not mention Fortini's constitutional claim, Chambers, or the Fourteenth Amendment.

The Appeals Court affirmed the conviction and, like the Commonwealth's brief, only addressed Fortini's claim in terms of Massachusetts evidence law. The court said that the trial court might have erred in not admitting the evidence of Monterio's behavior, Fortini, 692 N.E.2d at 113 n.6, but it found (in substance) that any error was harmless. The Massachusetts harmless error standard for objected-to, non-constitutional

-6-

trial errors is that "the error did not influence the jury, or had but very slight effect." Commonwealth v. Alphas, 712 N.E.2d 575, 580 n.7 (Mass. 1999). The Appeals Court gave two reasons:

First, the Appeals Court noted that Fortini was permitted to introduce other evidence of Monterio's actions which supported Fortini's contention that Monterio had acted aggressively that evening. Specifically, the court pointed to the evidence of Monterio's shouting and cursing at the house earlier in the evening. Thus, the court held, Fortini was already able to establish Monterio's "state of mind" and the evidence of the basketball court incident "was to some degree cumulative." Fortini, 692 N.E.2d at 113.

Second, and more central to its decision, the court found that Fortini's "appearance with a loaded shotgun on the darkened porch, coupled with his decision to eschew any retreat to the safety of his apartment, were deliberate acts of defiance, not defense." Fortini, 692 N.E.2d at 114. On this premise, the court held that even if it was error to exclude the basketball court incident, Fortini had suffered no prejudice because he could not, as a matter of law, show that he acted in self defense in light of his decision to "lie in wait" on the porch rather than retreating to the safety of his apartment when

-7-

given the opportunity.  Id.  The Supreme Judicial Court denied further appellate review.  Commonwealth v. Fortini, 699 N.E.2d 850 (Mass. 1998).

Fortini filed a petition for writ of habeas corpus, which the federal district court dismissed on the grounds that he had not exhausted available state remedies as the statute governing habeas petitions requires.  28 U.S.C. § 2254(b)(1). Although conceding that Fortini's state court briefs contained "isolated references" to his federal constitutional rights, the district court said that they did not include a "developed argument elaborating any particular claim."  The district court observed that the state appeals court had not addressed Fortini's constitutional claim, suggesting that it had been unaware that such a claim was being pressed.

Fortini now appeals to this court.  He argues that the district court erred in finding that he did not properly present his constitutional claim in state court and, in addition, says that excluding the basketball court episode denied him due process under Chambers and had a likely effect on the jury's verdict.  The Commonwealth, while partly addressing the merits of Fortini's claim, rests primarily on the district court's waiver argument and on the strict standards for habeas now applicable under the Antiterrorism and Effective Death Penalty

-8-

Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996). <u>See</u> 28 U.S.C. § 2254(d)(1) (Supp. II 1996).

1. The threshold question in this case is whether Fortini exhausted his state remedies. The Commonwealth says that Fortini "did little if anything to properly alert the Commonwealth's courts that he was asserting a federal constitutional claim" and thus he is not entitled to habeas review. The district court agreed, finding that while Fortini had argued that the exclusion of the basketball court incident implicated state evidence law issues, he had not adequately raised the constitutional claim. We review <u>de novo</u> the district court's dismissal on this ground. <u>Adelson</u> v. <u>DiPaola</u>, 131 F.3d 259, 262 (1st Cir. 1997).

Exhaustion requires that a petitioner have "fairly presented to the state courts" his constitutional claim. <u>Picard</u> v. <u>Connor</u>, 404 U.S. 270, 275 (1971). This requires that the issue be presented "in such a way as to make it probable that a reasonable jurist would have been alerted to the existence of the federal question," <u>Scarpa</u> v. <u>DuBois</u>, 38 F.3d 1, 6 (1st Cir. 1994), <u>cert. denied</u>, 513 U.S. 1129 (1995), for example, by "specific constitutional language, constitutional citation, [or] appropriate federal precedent . . . ." <u>Nadworny</u> v. <u>Fair</u>, 872 F.2d 1093, 1101 (1st Cir. 1989). By contrast, "a passing

-9-

reference" to a constitutional issue will not preserve it for habeas review. <u>Martens</u> v. <u>Shannon</u>, 836 F.2d 715, 717 (1st Cir. 1988). Exhaustion is a closer issue than either side admits, but in the end we think that Fortini did adequately present his federal claim based on <u>Chambers</u> v. <u>Mississippi</u> in the state appellate courts. The first section in Fortini's brief to the Massachusetts Appeals Court--attacking the exclusion of the basketball court episode--was titled, "The Trial Court Violated The Defendant's State And Federal Constitutional Rights to Due Process And A Fair Trial By Denying Him The Right To Present Highly Relevant Evidence." His petition for further appellate review to the SJC included virtually identical language.

In addition, the first case cited in the section was <u>Chambers</u> v. <u>Mississippi</u>. After discussing the factual predicate for the legal claim, the section concluded with further citations to <u>Chambers</u> and <u>Webb</u> v. <u>Texas</u>, 409 U.S. 95 (1972) (due process clause protects defendant's right to present witnesses), and the assertion that "the exclusion of . . . evidence denied the defendant a trial in accordance with fundamental standards of due process." The brief's addendum included the text of the Fourteenth Amendment, as required by Massachusetts rules for appeals raising constitutional claims. Mass. R. App. Proc. 16(f).

-10-

In short, Fortini's papers included many of the "trappings" that we have previously recognized to be central to presenting a claim. Nadworny, 872 F.2d at 1101; accord Williams v. Lord, 996 F.2d 1481, 1483 (2d Cir. 1993), cert. denied, 510 U.S. 1120 (1994). Admittedly, Fortini's constitutional argument may have been obscured by his emphasis on Massachusetts cases that deal with rules of evidence. See Adelson, 131 F.3d at 263. Nonetheless, we think that the briefs' language and citations should have alerted the court that a constitutional argument was also being made. That the Appeals Court did not address the constitutional issue is not controlling. Pettijohn v. Hall, 599 F.2d 476, 480 n.2 (1st Cir.), cert. denied, 444 U.S. 946 (1979).

We note that Fortini apparently failed to raise the constitutional claim in the state trial court when he there urged the admission of the fight evidence. In all likelihood, the Appeals Court could have refused to consider the due process argument because it was not pressed in the trial court, see Commonwealth v. Bibby, 624 N.E.2d 624, 628 (Mass. App. Ct. 1993), although it also had discretion to consider the claim even if it was not raised earlier, Commonwealth v. Curtis, 632 N.E.2d 821, 825 (Mass. 1994).

However, the Appeals Court did not purport to reject the federal constitutional claim on grounds of state waiver law.

-11-

Nor did the federal district court rest on Fortini's failure to raise the issue at the trial stage. Neither in briefing nor in oral argument in this court did the state argue that Fortini's failure to raise the constitutional issue at the trial stage precludes the argument in federal court. We conclude that the state has itself waived any objection to the habeas petition based on Fortini's failure to raise the constitutional issue at trial. Adelson, 131 F.3d at 263-64.

2. Turning to the merits, Fortini's constitutional claim presents a difficult issue that cannot be said to be directly governed by existing Supreme Court precedent. In Chambers, a state capital murder case, seemingly reliable hearsay evidence (from several witnesses) of a confession by someone other than Chambers was excluded at his trial. The "someone else" was called as a witness but denied being the culprit, and Chambers' ability to question the "someone else" in court was severely curtailed by the old-fashion rule limiting impeachment of one's own witness. The Supreme Court reversed: it said that in such extreme circumstances, the exclusion of the evidence violated due process principles. Chambers, 410 U.S. at 302.

Although Chambers unquestionably remains "the law," e.g., Crane v. Kentucky, 476 U.S. 683, 690 (1986), the Court has

-12-

rarely used it to overturn convictions and in recent years has made clear that it can be invoked only in extreme cases. Most recently, a majority of the Court said that a state law justification for exclusion will prevail unless it is "arbitrary or disproportionate" and "infringe[s] upon a weighty interest of the accused," United States v. Scheffer, 523 U.S. 303, 308 (1998). See also Montana v. Egelhoff, 518 U.S. 37, 53 (1996) (plurality opinion suggestion that any justification is sufficient to satisfy due process).

Inevitably, the lower federal courts have tended to "balance" incommensurate competing interests, taking account of the importance of the testimony to the defense, its inherent strength and reliability, and various kinds of countervailing reasons for excluding it offered by the state. E.g., Pettijohn, 599 F.2d at 480-81. Nevertheless, in cases less powerful than Chambers, a defendant whose proffer of evidence was rejected for any conventionally plausible reason or rule usually has an uphill struggle.

Admittedly, Fortini has a strong argument that the evidence in question should have been admitted under conventional evidence rules. To begin, the evidence was relevant to Fortini's claim of self defense, and here the trial judge was misled. Although the evidence of the basketball court

-13-

episode was certainly not relevant to Fortini's state of mind (since he did not then know about the fight), it was relevant to Monterio's state of mind, making it more likely than it would be without the evidence that Monterio lunged at Fortini, as the latter claimed. This in turn might have helped Fortini if the jury had doubts about his story--a key qualification to which we will return.

Of course, relevant evidence is excluded all the time where other considerations override relevance. Here, it might look as if the basketball court incident was merely character evidence, tending to portray Monterio as a violent man. Such evidence is commonly excluded by courts because of its remoteness and tendency to prejudice the jury. Fed. R. Evid. 404; see, e.g., United States v. Varoudakis, 233 F.3d 113, 118-19 (1st Cir. 2000). But in a federal court, and so far as we can tell under Massachusetts law, the basketball court incident was so close in time to the shooting as to suggest that it might fall within the exceptions that admit (where pertinent) acts demonstrating state of mind and emotion of the actor, here Monterio.[4]

---

[4]See United States v. Aguilar-Arenceta, 58 F.3d 796, 798 (1st Cir. 1995); Government of the Virgin Islands v. Carino, 631 F.2d 226, 229 (3d Cir. 1980); Commonwealth v. O'Brien, 736 N.E.2d 841, 852 (Mass. 2000); Commonwealth v. Scullin, 687 N.E.2d 1258, 1263 (Mass. App. Ct. 1997).

-14-

Prejudice is a different question. Even highly relevant evidence can be excluded if it is unduly prejudicial. The evidence in question was certainly prejudicial in the pertinent sense, that is, it invited the jury to acquit because it made Monterio out to be a violent and dangerous man of whom the world was well rid. But the state court did not exclude the evidence on grounds of undue prejudice and there is no certainty that it would have done so if it had appreciated the relevance of the evidence. Nor did the Appeals Court mention prejudice of this kind.

It might thus be argued that there was <u>no</u> valid justification invoked for excluding the evidence. The Appeals Court itself assumed <u>arguendo</u> that the evidence should not have been excluded. Although the SJC has never squarely addressed the issue, it is hard for us to see why--assuming relevance--such bad acts would be categorically inadmissible where offered to show the state of mind of the victim rather than the state of mind of the defendant. There is ample precedent elsewhere for admitting evidence on this theory. <u>E.g.</u>, <u>State</u> v. <u>Day</u>, 535 S.E.2d 431, 436 (S.C. 2000); <u>Randolph</u> v. <u>Commonwealth</u>, 56 S.E.2d 226, 231 (Va. 1949).

Yet not every <u>ad hoc</u> mistake in applying state evidence rules, even in a murder case, should be called a violation of

-15-

due process; otherwise every significant state court error in excluding evidence offered by the defendant would be a basis for undoing the conviction. The few Supreme Court cases that actually undid convictions based on a Chambers analysis involved far more egregious situations; and the more recent decisions of the Court we have cited create serious doubts that the Court is interested in carrying the doctrine beyond egregious cases.

Chambers and Crane both involved highly probative evidence absolutely critical to the defense, 410 U.S. at 302; and 476 U.S. at 690; and the third (and last) decision favoring a defendant, Rock v. Arkansas, 483 U.S. 44, 55 (1987), concerned a defendant's own right to testify. By contrast, in the present case the defendant offered direct testimony on the pertinent issue--whether Monterio lunged at him. The basketball court incident that was excluded is at best indirect evidence which does no more than add to existing proof that Monterio was in a mood to lunge.

Because this case is sufficiently weaker than Chambers, Crane and Rock, it would be easy to uphold the state court ruling under AEDPA's ordinary standard for evaluating state legal determinations, if that standard were applicable. In habeas proceedings, a federal court is now directed to accept a state legal ruling unless it is "contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). The state says that this rubric governs in the present case, but the state is mistaken.

AEDPA's strict standard of review only applies to a "claim that was adjudicated on the merits in state court proceedings." 28 U.S.C. § 2254(d). Here, the federal claim was never addressed by the state courts. All of the cases that have touched on this problem (none is directly in point) assume that the statute applies only when the state court decided the federal issue.[5] After all, AEDPA imposes a requirement of deference to state court decisions, but we can hardly defer to the state court on an issue that the state court did not address. Cf. Williams v. Taylor, 529 U.S. 362, 402-06 (2000).

Nevertheless, viewing the issue de novo, we conclude that the exclusion of evidence in question does not rise to the level of a Chambers violation. The evidence at best lies on the margin of a blurred line that divides character evidence, commonly but not always excluded, cf. Fed. R. Evid. 404, from state-of-mind evidence; the evidence at best does no more than

---

[5]See Smith v. Massey, 235 F.3d 1259, 1264-65 (10th Cir. 2000); Weeks v. Angelone, 176 F.3d 249, 258-59 (4th Cir. 1999); Moore v. Parke, 148 F.3d 705, 708 (7th Cir. 1998); cf. Nobles v. Johnson, 127 F.3d 409, 416 (5th Cir. 1997), cert. denied, 523 U.S. 1139 (1998).

-17-

increase somewhat the likelihood of a lunge, already the subject of Fortini's direct testimony; and the risk of unfair prejudice to the prosecution was real even if many courts would not have chosen to exclude the evidence on this ground.

It is very difficult to predict the evolution of Chambers because in over 30 years it has been used by the Supreme Court only a handful of times to overturn convictions; and the Supreme Court's standards are quite vague, although understandably so in a due process matter. Although this is a close case, exclusion of the evidence does not in our view add up to the kind of fundamental unfairness that warrants a federal court in finding a violation of due process. The exclusion in our view was error but it was not constitutional error.

3. Even if exclusion of the evidence were a constitutional error, we would find the error to be harmless. This is itself a close question, turning on the proper standard for judging harmless error. Still, because the constitutional "merits" are debatable, it is useful to address this alternative ground for affirmance.

Because we are assuming constitutional error, it might at first blush be thought that the error must be harmless "beyond a reasonable doubt" under Chapman v. California, 386 U.S. 18, 24 (1967). Chapman continues to govern on direct

appeal (although why a constitutional error should be intrinsically different than some other kind of serious error is unclear); but more recently in Brecht v. Abrahamson, 507 U.S. 619, 638 (1993), the Supreme Court adopted a different test for habeas more favorable to the prosecution, namely, that the error (constitutional or not) is harmless if it did not have a substantial and injurious effect or influence on the jury's verdict.

Brecht's standard could in theory be restricted to cases in which the state court had itself applied Chapman (so that Brecht would be an expression of deference to a state determination). Most circuits, however, have taken the view that Brecht applies in habeas corpus cases without qualification.[6] One can find the language in Brecht pointing in both directions, but most of its expression of rationale suggests that the Brecht test applies in habeas cases regardless of whether the state court itself made a Chapman harmless error analysis. See Tyson v. Trigg, 50 F.3d 436, 446 (7th Cir. 1995) (Posner, C.J.).

---

[6]Compare Bains v. Cambra, 204 F.3d 964, 976-77 (9th Cir.), cert. denied, 121 S. Ct. 627 (2000) (collecting numerous cases applying Brecht), with Orndorff v. Lockhart, 998 F.2d 1426, 1430 (8th Cir. 1993) (contra), cert. denied, 511 U.S. 1063 (1994).

-19-

Assuming that <u>Brecht</u> applies, we do not think that the excluded evidence in this case would likely have affected the outcome, but our reasons are different than the harmless error ruling made by the state Appeals Court.  The Appeals Court, it will be recalled, said that the basketball court incident was somewhat cumulative and, in any event, could not have altered the outcome:  this was so because, regardless of what happened on the porch, Fortini undermined his self-defense claim when he chose to appear on the porch carrying his shotgun and then failed to go upstairs when he heard whispering on the sidewalk.

The implication of the Appeals Court's reasoning is that the evidence for Fortini's claim of self-defense was so weak that the defense should not have been submitted to the jury or, in the alternative, that no reasonable jury could have accepted it.  But no SJC case law adopts such a view:  on the contrary, the SJC's stress is on the fact-specific character of the defense and the need for a jury evaluation whenever the issue is debatable.[7]  The Appeals Court's reading of  state law

---

[7]Massachusetts requires a self-defense instruction if the evidence, seen in the light most favorable to the defendant, shows that the defendant:  (1) had a reasonable belief he was in imminent danger of death or serious bodily harm; (2) availed himself of all reasonable means of escape; and (3) used no more force than reasonably necessary.  <u>Commonwealth</u> v. <u>Harrington</u>, 399 N.E.2d 475, 479 (Mass. 1980).  "[W]hether a defendant used all reasonable means of escape before acting in self-defense is a factual question dependent on a variety of circumstances."

is usually "trustworthy data" but it is not binding on a federal court, <u>Losacco</u> v. <u>F.D. Rich Constr. Co.</u>, 992 F.2d 382, 384 (1st Cir.), <u>cert. denied</u>, 510 U.S. 923 (1993), and in this case the state itself does not defend the Appeals Court's harmless error reasoning.

Here, Fortini's version of events, which the jury could have accepted, was that he was encouraged by the police dispatcher to obtain a license plate or other identification if the harassing party returned; that he went to the porch without aggressive intent carrying the shotgun solely for self-defense; that when he heard the threatening language from Monterio and heard Monterio's footsteps, he (Fortini) made no effort to shoot or advance but told Monterio to get off the porch, and that he fired only after Monterio lunged at him. If it accepted all of this, a jury might rationally have accepted Fortini's claim of self-defense.

Nor are we persuaded by the Appeals Court's other reason for thinking that the fight evidence did not matter, namely, that it was cumulative of other evidence (his apparent "drive by" cursing) showing Monterio's aggressive intent on the night of the incident. It is one thing to yell epithets from a

---

Commonwealth v. <u>Pike</u>, 701 N.E.2d 951, 957 (Mass. 1998). <u>Cf.</u> Commonwealth v. <u>Latimore</u>, 393 N.E.2d 370, 373 (Mass. 1979).

-21-

passing car; quite another--and far more shocking--to attack four men who, so far as appears, were engaged in playing basketball and had done nothing to provoke Monterio. That this incident occurred only minutes before Monterio appeared on Fortini's porch makes the evidence even more telling in support of Fortini's claim.

However, we do think that the exclusion of the fight evidence was harmless error under Brecht for a quite different reason. Fortini's only legitimate reason for introducing the basketball court episode was to back up his own testimony that Monterio lunged at him, forcing him to fire in self defense. Our own independent review of the record, Rushen v. Spain, 464 U.S. 114, 120 (1983) (per curiam); Sinnott v. Duval, 139 F.3d 12, 15 (1st Cir. 1998), shows that Fortini's version of what happened on the porch was subject only to limited challenge by the state and, far more important, the state's answer to the self-defense claim did not depend at all on whether Monterio lunged.

Fortini gave the only direct testimony on whether Monterio lunged and the state did not cross examine him on the point. However, the state did raise doubts indirectly: Lopes testified for the state that Monterio was slowly moving up to the porch in Fortini's direction when Fortini shot him and a

state expert, in necessarily speculative testimony, said that a study of the wounds suggested that Monterio was at some distance when Fortini fired.

Nevertheless, the state's basic argument to the jury bypassed the lunge issue. In its opening, the prosecution conceded that Monterio "may have taken a step" towards Fortini. In its summation the prosecution never argued that Monterio had not lunged at Fortini (it again admitted that he took a step towards Fortini once he saw him with the gun). Instead, it contended that the shooting was not a "split-second situation" where Fortini was suddenly at risk and that Fortini had gone armed to the porch looking for trouble.

The prosecution throughout the proceedings asserted that Fortini had been angered by Monterio's earlier shouts at the house; the prosecution offered evidence that he (Fortini) was openly racist; and it argued that by the time Fortini went down to the porch he had decided that he wanted to shoot the perceived troublemakers. The jury's verdict suggests strongly that it bought this view--not because it had to (the Appeals Court's position) but because it was an available and plausible theory to negate self defense and was the only theory actually argued to it for that purpose.

-23-

It is true that the excluded evidence could have helped Fortini in a quite different way than as support for Fortini's lunge testimony. By suggesting that Monterio was a violent and dangerous individual, it might have encouraged the jury to acquit Fortini on the ground that Monterio was a wicked man who ought to be put out of business. But unless the evidence was necessary to a legitimate defense, this inference would be an argument for excluding the evidence--not for admitting it. See Strong, McCormick on Evidence § 190 (5th ed. 1999). However mistaken under state law, a ruling whose only ultimate effect was to deprive the defendant of an improper defense is hardly a basis for granting the writ. Cf. Burks v. DuBois, 55 F.3d 712, 715-16 (1st Cir. 1995).

To sum up, the legitimate use of the evidence would in our view have had only a very small likelihood of altering the result. This is not sufficient under Brecht. We could not say exclusion was harmless "beyond a reasonable doubt" under Chapman (since the jury might have disregarded the state's argument and made everything turn on the lunge). But even if the consensus of the circuits is wrong and Chapman does apply to habeas, we still think that there was no Chambers violation for reasons already explained.

For the reasons stated, the judgment of the district court is <u>affirmed</u>. Counsel for Fortini is commended for his very able representation in this difficult case.

<u>It is so ordered.</u>