**Raymond ELLSWORTH**

v.

**WARDEN, NEW HAMPSHIRE STATE PRISON, and Philip T. McLaughlin, Attorney General for the State of New Hampshire**

**No. CIV.99–132–JD.**

United States District Court, D. New Hampshire.

Feb. 21, 2002.

98

Andrew R. Schulman, Getman, Stacey, Tamposi, Schulthess & Steer, Bedford, NH, for Raymond Ellsworth.

James D. Rosenberg, NH Attorney General's Office, Concord, NH, for Warden, New Hampshire State Prison.

## REDACTED ORDER

DICLERICO, District Judge.

The petitioner, Raymond Ellsworth, seeks habeas corpus relief pursuant to 28 U.S.C.A. § 2254 from his state court conviction and sentence for sexual assault. Ellsworth alleges that the state trial court's decision to exclude evidence and not to disclose certain privileged information, affirmed by the New Hampshire Supreme Court, violated his constitutional rights. The parties have filed renewed motions for summary judgment and objections.

*Background*

The parties are satisfied that the factual background in the court's previous summary judgment order suffices for purposes of the pending motions and objections. Therefore, the factual background is reproduced from the order of February 23, 2001, as follows.[1]

From October of 1988 through September of 1992, Raymond Ellsworth was employed by Spaulding Youth Center, a residential school and treatment facility for boys with emotional, developmental, and behavioral problems. At Spaulding, Ellsworth was a cottage teacher for Colcord Cottage, which housed younger emotionally disturbed boys. In that role, Ellsworth supervised the boys in his group after school, during meals, and at other times during the day and night. He organized sports activities and took students on off-campus trips for bicycling, swimming, and field trips. He also met with several students each week for "kid meetings." Approximately once a week, Ellsworth slept in the staff room at the cottage and handled any problems that arose during the night.

In November of 1992, an eleven-year-old boy, who lived in Colcord Cottage and participated in weekly "kid meetings" with Ellsworth, accused Ellsworth of sexually abusing him. The boy described three separate incidents of abuse by Ellsworth, that he said had occurred during the spring and summer of 1992. One incident he said happened while he was bicycling alone with Ellsworth, another was during a swimming outing with Ellsworth and another Spaulding boy, and the third was late at night at Colcord Cottage after the boy returned from a home visit. Ells-

---

1. The names of the eleven-year-old boy who accused Ellsworth and one other witness, who was a minor when he testified at trial, were used in the sealed order and are deleted here. The boy who accused Ellsworth is referred to as "the boy," and the other witness is referred to as "the other boy."

worth was indicted on four counts of aggravated felonious sexual assault and eight counts of felonious sexual assault. He denied all of the charges against him.

Before trial, the defense sought discovery of privileged materials related to the charges against Ellsworth. He requested a dormitory incident report for the night the boy returned to Colcord Cottage where he said one of the incidents of abuse occurred, records relating to the boy's prior sexual victimization, records documenting the boy's first accusation against Ellsworth, and records relating to the boy's disciplinary history. The trial court reviewed the records in camera but did not disclose them to defense counsel.

At trial, in January of 1995, the boy testified about three incidents of sexual abuse by Ellsworth. The boy said that during the summer of 1992, he and Ellsworth went on a bicycle ride together near the Spaulding campus. He said that Ellsworth lured him into the woods by saying that he heard a noise in the woods. Once in the woods, the boy testified that Ellsworth pulled down his pants and told the boy to touch and put his mouth on his penis. The boy said that Ellsworth told him not to tell anyone or he would get hurt.

Ellsworth denied that the incident ever occurred. He testified that he had often taken groups of students on bicycle trips, which might have included the boy, but he denied ever being alone with the boy on a trip. Another Spaulding resident testified that the boy told him that the incident occurred when he stopped on a bicycle trip to urinate and Ellsworth followed him into the woods.

The second incident the boy recounted occurred when Ellsworth took the boy and another Colcord Cottage boy to swim at Sandoggerdy Pond near Spaulding. The boy testified that after playing with both boys in the water, Ellsworth told the other boy to swim away. Then, the boy said, while standing in water up to his chest, Ellsworth pulled down both of their bathing suits and touched the boy's penis and buttocks. Ellsworth told the boy to put his mouth on Ellsworth's penis, which he did by going under water. On cross-examination, the boy also testified that Ellsworth anally raped him under water. The boy said that Ellsworth again told him not to tell anyone and threatened him.

Ellsworth testified that he remembered going to the pond with the boy and the other boy, but he denied that any sexual incident occurred. The other boy testified that he had been on two trips with the boy and Ellsworth to Sandoggerdy Pond. He said that there were other people at the beach playing with their kids and swimming, that he was swimming and talking to people within twenty feet of the boy and Ellsworth but not paying close attention to them, that the boy was playing with Ellsworth in the same way he did with other staff members, and that he neither saw nor heard anything unusual. He also testified that he saw nothing of a sexual nature occurring between Ellsworth and the boy.

The boy testified that the third incident of abuse occurred when he returned early to Spaulding from a weekend home visit because he had been misbehaving at home. His mother dropped him off at his cottage late at night. The boy testified that Ellsworth was the only staff person on duty in the cottage and that no one was asleep in the staff bedroom. The boy said that while he was putting on his pajamas Ellsworth came into his room and began touching him, and at Ellsworth's direction, the boy also touched and put his mouth on Ellsworth's penis, as he had done at the pond.

Ellsworth testified that he never sexually abused the boy in the cottage or in any

of the other alleged incidents. Edward DeForrest, the Executive Director of Spaulding, testified that the policy at Spaulding was not to have one staff member alone in a cottage. Except when necessary due to scheduling problems, at night the cottage teacher would sleep while another staff person, the "wake-over," stayed awake.

Another Spaulding resident who was the boy's roommate beginning in October of 1992, after Ellsworth left Spaulding, testified that the boy told him that Ellsworth molested him in the afternoon at the cottage during a "kid meeting." The boy also told the roommate that nothing happened at night.

The defense moved to introduce, through cross-examination of the boy, evidence of the boy's prior sexual abuse, when he was about three years old. The man accused in 1985 of abusing the boy was charged with acts of fellatio and digital anal intercourse, but the charges against him were dropped when it was determined that the boy was not competent to testify against him. The trial court ruled that the evidence was irrelevant because the abuse was different from the abuse alleged against Ellsworth and because the defense had not proven their theory that the prior abuse gave the boy an alternative source for the information used in his allegations against Ellsworth.

The defense also moved to introduce the testimony of Craig Klare, a counselor who supervised the boy at the Pine Haven School, another residential treatment and educational facility for emotionally disturbed boys, where the boy lived after he left Spaulding. The defense proferred that Klare would testify that the boy made two false accusations of sexual voyeurism and a false accusation of theft against other residents at that school. The court denied the motion, but permitted cross-examination of the boy about those incidents at Pine Haven School. The boy denied making the reported accusations and denied having lied to Klare.

Following trial, Ellsworth was convicted of two counts of aggravated felonious sexual assault and five counts of felonious sexual assault.[2] He was sentenced to eighteen and one-half to thirty-seven years in prison, stand committed, and fourteen to twenty-eight years, deferred. His convictions were affirmed on appeal. *See State v. Ellsworth*, 142 N.H. 710, 709 A.2d 768 (1998).

### Procedural History in this Court

Ellsworth filed his habeas petition on March 23, 1999. He moved to expand the record to include the privileged documents that were reviewed in camera by the trial judge prior to Ellsworth's criminal trial. He asked this court to review the documents and to disclose documents to the parties to the extent they supported his claim that he was denied his right to discover and present exculpatory evidence. The respondents did not object to Ellsworth's request to expand the record but did object to disclosure of the documents. The court granted the motion to expand to include the privileged documents reviewed in camera by the trial judge, but denied Ellsworth's request that the documents be disclosed.

The court received four sealed packages of documents from the Merrimack County Superior Court on January 28, 2000. After reviewing the documents and the trial judge's orders describing the documents he reviewed in camera, this court concluded that it had not received all of the docu-

---

**2.** He was acquitted of one count, and the state nol prossed another count of aggravated felonious sexual assault and three counts of felonious sexual assault.

ments reviewed by the trial judge. On February 17, 2000, this court ordered the respondents to forward the remaining documents that were reviewed in camera by the trial judge to this court by March 3, 2000.

On March 2, 2000, the respondents filed a reply to the court's order of February 17. The respondents explained that their counsel had contacted the Merrimack County Superior Court and requested the staff locate any records or documents pertaining to the boy's treatment at Spaulding, notes of the boy's therapist, the critical incident report for one of the charged incidents, and the boy's disciplinary history at Spaulding. The staff indicated that the four packages sent to this court included everything that was reviewed in camera in Ellsworth's case and that the file did not include references that would suggest that parts might have been returned to Spaulding or to the boy's therapist. The respondents also contacted the attorney who served as guardian ad litem and he indicated that he did not have any of the documents.

In response, this court again reviewed the documents submitted to this court and the trial judge's orders pertaining to the documents he reviewed in camera. This court again concluded that the trial judge had reviewed documents that were not included in the documents submitted in this case. In an effort to complete the record, this court directed the respondents to contact the New Hampshire Supreme Court to determine if any of the missing documents were on file there.

The respondents filed a response to that order saying that their counsel had contacted the state supreme court and no documents were found. The respondents also reported, however, that during the week of March 13, 2000, the Merrimack County Superior Court called to tell them that more documents had been found

there. Those documents were forwarded to this court. No additional documents have been submitted, and the case has proceeded on the record as expanded to include the additional documents provided from the state court. No additional documents have been provided to this court.

The parties filed motions for summary judgment during the fall of 2000, which the court addressed in an order dated February 23, 2001. Summary judgment was granted in the respondents' favor with respect to Ellsworth's claim that the state courts violated his Fourteenth Amendment right to present exculpatory evidence by excluding the testimony of Craig Klare. With respect to Ellsworth's Sixth Amendment claim based on the exclusion of evidence of the boy's prior sexual abuse, the court concluded that a genuine issue of fact remained which precluded summary judgment. As to Ellsworth's Fourteenth Amendment claim concerning non-disclosure of the documents reviewed by the trial judge in camera, the court concluded that some of the documents reviewed in camera by the trial judge might be material based on the discovery issues raised by Ellsworth in his petition. For that reason, the court disclosed certain information in redacted copies to counsel of record. The disclosed information included Spaulding incident reports, records pertaining to the boy's early sexual abuse and subsequent treatment, records pertaining to the boy's discipline and behavior, and notes made by the boy's therapist, Brian Blake.

The parties were to file renewed motions for summary judgment on or before March 23, 2001. After requesting and receiving several extensions of time, the parties filed their renewed motions for summary judgment. On June 19, 2001, before the parties filed their responses, the respondents filed an assented-to motion to stay the habeas corpus proceeding. In the

motion, the respondents explained: "The parties have reached an understanding that their interests—and the interests of justice—will be better served by filing a joint motion to amend the petitioner's sentence in state court, rather than by further litigation in this Court. Today, the parties filed such a motion in Merrimack County Superior Court. If that motion is granted, the parties will file a joint stipulation in this Court, pursuant to LR 41.1, to dismiss the instant habeas corpus petition with prejudice." The court granted the motion with the requirement that the Attorney General file monthly status reports beginning on August 1.

On August 1, 2001, the respondents filed an assented-to motion to lift the stay. The respondents reported that the motion to amend sentence was filed in Merrimack County Superior Court and a hearing was held to consider the motion. After the hearing, the state court issued an order denying the parties' motion to amend sentence. Therefore, the respondents asked that the stay of the habeas proceeding in this court be lifted and that the date for filing their responses to the renewed motions for summary judgment be set for October 1, 2001. That motion was granted, and the parties were directed to file their responses by October 30, 2001, which they have done.

A hearing, involving only counsel, was held on Friday, December 7, 2001. The court directed counsel to address what Ellsworth and his counsel knew about the boy's treatment for sexual abuse and re-opening the case against the perpetrator of the prior abuse, the effect of the defense counsel's self-imposed limits on inquiry into the boy's sexual abuse group sessions, the materiality of withheld information, and their interpretations of the state courts' rulings that evidence of the prior sexual abuse was irrelevant. At the hearing, counsel agreed that the informa-tion that the prior sexual abuse included fellatio conduct was first available to the defense at the January 4, 1995, motion hearing. Counsel submitted additional affidavits and case law in support of their arguments.

Gary Lavallee, who is now the acting chief executive officer and program director at Spaulding and was the program director during 1992, provides information in his affidavit about Ellsworth's contact with the boy and access to information about the boy. [Redacted]

### Standard of Review

■ Summary judgment is appropriate in habeas proceedings, as in other civil actions, when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Fed. R.Civ.P. 81(a)(2). "[A]n issue is 'genuine' if the evidence presented is such that a reasonable jury could resolve the issue in favor of the nonmoving party and a 'material' fact is one that might affect the outcome of the suit under governing law." Fajardo Shopping Ctr. v. Sun Alliance Ins. Co., 167 F.3d 1, 7 (1st Cir.1999). Ordinarily, the court considers cross motions for summary judgment separately, "drawing inferences against each movant in turn." Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir.1997). When parties submit cross motions for summary judgment in a non-jury case on stipulated or materially undisputed facts, however, the case is submitted and the court must determine the inferences to be drawn from those facts. See Garcia–Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 643–44 (1st Cir.2000).

■ In the previous order on the parties' motions for summary judgment dated February 23, 2001, the court followed the standard provided by § 2254(d)(1), which requires deferential review of state decisions. Since that order issued in February of this year, however, the First Circuit interpreted § 2254(d)(1) to apply only when the federal claims were addressed by the state court. *See Fortini v. Murphy,* 257 F.3d 39, 47 (1st Cir.2001); *accord DiBenedetto v. Hall,* 272 F.3d 1, 7 (1st Cir. 2001). When the state court decision did not address the federal issue, the federal court applies a de novo standard of review rather than the deferential review mandated by § 2254(d)(1). *See Fortini,* 257 F.3d at 47 ("After all, AEDPA imposes a requirement of deference to state court decisions, but we can hardly defer to the state court on an issue that the state court did not address.").

In this case, the state court decisions did not address the federal issues with respect to either of Ellsworth's remaining claims. Ellsworth argued on appeal to the New Hampshire Supreme Court that the trial court's decision not to disclose certain confidential information, reviewed by the trial court in camera, violated his Fourteenth Amendment due process right, and that the court's decision not to allow cross-examination regarding the boy's prior sexual abuse violated his Sixth Amendment confrontation right. The supreme court did not address the issue of nondisclosure of the confidential information at all and relied exclusively on state law, without acknowledging the federal claim, to decide the cross-examination issue. Therefore, the de novo standard, rather than the more deferential standard of § 2254(d), applies for purposes of reviewing the New Hampshire Supreme Court's decision in the context of the present motions.

*Discussion*

A federal district court is authorized to consider a petition for a writ of habeas corpus on behalf of a petitioner who is in custody pursuant to a state court conviction "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." § 2254(a). Ellsworth contends that he is in custody because the New Hampshire Supreme Court affirmed his convictions on sexual assault charges in violation of the federal constitution. In particular, Ellsworth asserts that the trial court decisions, affirmed by the supreme court, denying him discovery of the evidence reviewed in camera, and excluding evidence of the boy's prior sexual abuse, violated his Sixth and Fourteenth Amendment rights. The respondents oppose Ellsworth's motion for summary judgment and move for summary judgment in their favor, arguing that Ellsworth's conviction was not affirmed in violation of the federal constitution and that any error was harmless.

A. *Exclusion of Evidence of the boy's Prior Sexual Abuse*

■ Ellsworth asserts that the trial court's decision, affirmed by the state supreme court, not to permit his counsel to introduce evidence of the boy's prior sexual abuse during cross-examination of the boy violated the Sixth Amendment. The right of cross-examination is guaranteed by the Confrontation Clause of the Sixth Amendment. *See Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Id.* at 316, 94 S.Ct. 1105. Despite the importance of cross-examination, "[t]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on cross-exam-

ination based on concerns about ... harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). A violation of the Confrontation Clause occurs if a defendant is prohibited from pursuing appropriate cross-examination that is designed "to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Davis,* 415 U.S. at 318, 94 S.Ct. 1105; *accord Van Arsdall,* 475 U.S. at 680, 106 S.Ct. 1431.

Prior to trial, the defense acquired some information about the boy's prior sexual abuse. In addition, because of Ellsworth's responsibilities at Spaulding, he knew that the boy had been sexually abused before he came to Spaulding and knew that the boy participated in sexual abuse counseling and treatment at Spaulding. In the course of pretrial discovery, the defense learned that the boy was sexually abused when he was between two and a half and four years old by an older adult male babysitter known as "Gramps," and that the perpetrator was charged with "anal penetration." The defense learned in a deposition of Jan Smith that the boy was participating in a sexual abuse boys group and was also receiving individual therapy. When asked if the prior abuse also included oral sexual conduct, Smith answered that she did not recall reading that.

In December of 1994, before trial in January of 1995, the defense moved to be allowed to cross-examine the boy at trial about his prior sexual abuse. The defense argued in support of the motion that the boy's prior experience as a boy of anal sexual abuse was relevant to explain why he could describe sexual acts and to show the possibility that he was fabricating his charges against Ellsworth. The defense

noted that the boy had accused Ellsworth of anal intercourse in one police interview but not in others.

At the hearing on the motion, defense counsel argued both that the evidence of prior sexual abuse explained the boy's knowledge of anal intercourse and provided a motive for the boy to fabricate charges because he enjoyed the positive attention he received after the prior abuse was discovered. After defense counsel made her argument, the prosecutor revealed, for the first time, that the perpetrator of the prior sexual abuse was charged with sexual assault based on acts of fellatio and digital anal penetration, not anal intercourse as asserted by defense counsel. No further information was provided about the nature of the prior sexual abuse. The guardian ad litem argued that the prior abuse was so long in the past it should not be brought up again and that it would be detrimental to the boy to do so. In response, defense counsel pointed out that the boy had been undergoing constant treatment for sexual abuse and acknowledged that in light of the ongoing treatment, the prior abuse would not be the only source, other than Ellsworth's alleged abuse, of the boy's precocious sexual knowledge.

The trial court ruled that the prior abuse was irrelevant because the previous charges and the accusations against Ellsworth differed as to the type of anal intercourse and because the defense did not prove that it was the prior abuse rather than any other experience, that might have provided Matthew with sexual information to make the allegations against Ellsworth. The trial court never mentioned the common element of fellatio conduct in both the prior abuse and the accusations against Ellsworth. On appeal, the supreme court affirmed, holding that because the boy was in sexual abuse therapy, the prior abuse was not the only source of the boy's sexual

information, and that the probative value of the evidence of the boy's prior sexual abuse was "almost negligible." *Ellsworth*, 142 N.H. at 721, 709 A.2d 768.

Before trial, the defense also moved to be permitted to examine the boy about his participation in sexual abuse group therapy sessions. In the motion and at argument on the motion, the defense sought to introduce only the general information that the boy participated in group sessions and not evidence of any specific statements that the boy or other participants made in the sessions. To comply with the court's previous order excluding evidence of the boy's prior sexual abuse, the defense planned not to refer to the sessions as dealing with sexual abuse issues or to its proper name as a child sexual abuse boys group. Instead, the defense proposed to describe the sessions as education on "good touch" and "bad touch" without any additional detail and explain that the group met frequently, that other students talked about what had happened to them, and that the boy participated. The defense argued that the evidence of the group sessions was relevant to show that the boy had an alternate basis of knowledge about sexual abuse and a basis for knowing how to make a claim of child sexual abuse.

The trial court granted the defense motion to permit cross-examination on the boy's participation in "good touch" and "bad touch" group sessions. At trial, in response to defense counsel's questions, the boy testified that he was taught about "good touch" and "bad touch" at Spaulding and that he participated in group discussions about good and bad touch, and fami-

lies and feelings. No evidence of the boy's prior sexual abuse was introduced at trial.

### 1. Constitutional violation.

■ The Confrontation Clause right to cross-examination is "witness specific" so that "a criminal defendant's entitlement to cross-examine a witness increases in sensitivity in direct proportion to the witness's importance to the prosecution's case." *Bui v. DiPaolo*, 170 F.3d 232, 241–42 (1st Cir.1999). In Ellsworth's case, his right to cross-examination was at its apex with respect to the boy who was the prosecution's only direct witness to the charges against Ellsworth and where there was no physical or eyewitness evidence to support the charges. Further, because the boy was only eleven years old when he made the accusations against Ellsworth and thirteen when he testified at trial, the possible sources of his knowledge of adult sexual activity were important. *See LaJoie v. Thompson*, 217 F.3d 663, 671 (9th Cir. 2000); *Grant v. Demskie*, 75 F.Supp.2d 201, 213–14 (S.D.N.Y.1999).

■ The state trial court ruled that the evidence of the boy's prior sexual abuse was irrelevant and the state supreme court affirmed, characterizing the evidence as of negligible probative value. Those conclusions were apparently derived from the prosecutor's argument that the evidence was not relevant because the prior abuse involved digital anal penetration while the boy had accused Ellsworth, in one police interview, of anal intercourse.[3] The state courts ignored the common element of fellatio in both the prior abuse and the charges against Ellsworth.[4] No specific

---

3. The boy accused Ellsworth of sexual abuse involving acts of fellatio, and Ellsworth was charged with sexual assault based on those allegations. In one police interview, however, the boy also accused Ellsworth of penile anal penetration during the incident at the pond. Ellsworth was not charged with that act. On cross-examination at trial, however,

the boy again repeated the accusation of anal penile penetration when he was reminded that he had once told the police that had happened.

4. Although the respondents fault the defense for failing to point out that fellatio was common to both situations, the record shows that

information was provided about the nature of fellatio conduct in the prior abuse to distinguish those events from the specific accusations the boy made against Ellsworth.

Based on the information available, the evidence of the boy's prior abuse involving fellatio and his subsequent counseling and treatment for that particular abuse, might have shown that the boy had a source of knowledge of adult sexual behavior other than the alleged abuse by Ellsworth. As such, that evidence might have provided facts from which jurors could have appropriately drawn inferences related to the reliability of the boy as a witness. *See Van Arsdall*, 475 U.S. at 680, 106 S.Ct. 1431. In the absence of the evidence, the jury was not given a reasonably complete picture of the boy's credibility. *See DiBenedetto*, 272 F.3d at 10. Because "the jury might have received a significantly different impression of [the boy's] credibility had [the defense] been permitted to pursue [the issue of prior sexual abuse on] cross-examination," the state court's decisions, excluding the evidence as irrelevant, violated Ellsworth's Sixth Amendment right to cross-examination. *Van Arsdall*, 475 U.S. at 680, 106 S.Ct. 1431.

### 2. Harmless error.

 A constitutional violation resulting from trial error, such as violation of the Confrontation Clause, is subject to harmless error review. *See Van Arsdall*, 475 U.S. at 684, 106 S.Ct. 1431. In *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the Supreme Court held that the harmless error standard used in *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) does not apply in habeas cases.[5] Instead, the Court held, harmlessness depended on whether "the error 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

The First Circuit continues to apply the *Brecht* standard in habeas cases decided after the Antiterrorism and Effective Death Penalty Act ("AEDPA") amended § 2254. *See Sanna*, 265 F.3d at 14. Uncertainty has arisen, however, as to whether the *Brecht* or the *Chapman* standard applies in post-AEDPA cases when the state court did not conduct a *Chapman* harmless error review. *See Fortini*, 257 F.3d at 48–49. Although the issue has not been resolved in the First Circuit, *see Sanna*, 265 F.3d at 14 n. 6, it appears likely that, along with a majority of circuits, the First Circuit would apply the *Brecht* standard, *see Fortini*, 257 F.3d at 48. Therefore, in this case harmlessness will be assessed under the *Brecht* standard.

 Under *Brecht*, the court evaluates the effect of the error in the context of the entire record. *See* 507 U.S. at 631, 113 S.Ct. 1710. In *Van Arsdall*, the Supreme Court provided several factors to be used to determine whether a Confrontation Clause error is harmless. *See* 475 U.S. at 684, 106 S.Ct. 1431. Those factors include the importance of the witness's

---

the defense was not aware that fellatio was involved in the prior abuse until that was revealed by the prosecutor at the hearing on Ellsworth's motion. At that point, the court and the defense were both made aware of the common element simultaneously.

**5.** Under *Chapman*, constitutional error is not harmless unless the court is satisfied that "the error was harmless beyond a reasonable doubt." *Sanna v. Dipaolo*, 265 F.3d 1, 14 (1st Cir.2001) (citing *Chapman*, 386 U.S. at 24, 87 S.Ct. 824). A constitutional error is not harmless if there is a reasonable possibility that the error contributed to the verdict. *See Chapman*, 386 U.S. at 24, 87 S.Ct. 824.

testimony in the state's case, whether the testimony was cumulative, whether there was corroborating or contradictory evidence on the point in evidence, the extent of the cross-examination permitted, and the overall strength of the state's case.[6] *Id.* "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless." *O'Neal v. McAninch,* 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) (internal quotation omitted). "Grave doubt" means "that in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id.* at 435, 115 S.Ct. 992.

The boy's credibility was crucial to the state's case. The defense sought to use evidence of the boy's prior sexual abuse in cross-examination to show that those incidents, combined with the boy's treatment and counseling for the prior abuse, provided him with sufficient information about adult sexual conduct to be able to make the accusations against Ellsworth. However, there was a paucity of evidence to explain why the boy would fabricate the charges against Ellsworth.

 The boy testified about the three incidents of alleged abuse by Ellsworth. Other testimony provided evidence about surrounding circumstances. The graphic detail of the boy's testimony is compelling. The detail with which the incidents are recounted militates against the possibility they were fabricated.

a. *The bike trip.*

The boy testified during direct examination that he went on bike trips with Ells-

worth during the summer of 1992. Usually he was part of a group of students, but once he went alone with Ellsworth. That day was hot, and the boy had been to school in the morning. They went on mountain bikes, which have a lot of gears to allow the rider to go uphill easily and go more slowly downhill. The boy said that they went on the usual route up a dirt road to Shed Road and then back to Spaulding. They stopped on the way up the hill and walked their bikes. That loop is known as the four-mile loop.

The boy testified that they stopped again as they were turning onto a cement road because Ellsworth said that he heard something in the woods and suggested that they go to check it out. They stepped over part of a barbed wire fence that had been pushed down. The boy noticed that there were three trees and a broken tree. Ellsworth stopped, took down his shorts, and told the boy to touch him on his private parts, which Ellsworth called his "dick." The boy complied. Ellsworth told him to touch him more, and Ellsworth's penis got bigger. Then, the boy said, Ellsworth told him to put his mouth on Ellsworth's penis, and the boy complied. The boy said that Ellsworth also took down the boy's shorts and touched the boy's penis with his hands.

The boy testified that he complied because he was scared. Ellsworth told him that if he told anybody, he or his family would get hurt. The boy testified that Ellsworth told him that the boy abused Ellsworth, that he did not abuse the boy, and that it was the boy's fault. The boy said that he felt scared and sick. As they rode back to Spaulding, the boy was silent because he was scared. He did not tell

---

**6.** Although the *Van Arsdall* harmless error factors were provided in the context of the *Chapman* standard, courts have also used the factors under the *Brecht* standard. *See, e.g.,* *Whelchel v. Washington,* 232 F.3d 1197, 1206 (9th Cir.2000); *Jones v. Gibson,* 206 F.3d 946, 957 (10th Cir.2000).

anybody about the incident when they got back.

Ellsworth testified that the boy was one of three students constituting his caseload during 1992. He denied that he ever abused the boy. He testified that it was unusual to take one student on a bike trip but that in a few instances he had taken individual students on a six-mile loop as a reward for good behavior. He never took the boy on that loop because the boy was not athletic and was not able to ride that far. It would have taken all day because they would have to walk the bikes on much of the trail.

He took groups to ride on the four-mile loop, which usually included the more athletic kids, because of the time it would take when kids, like the boy, could not ride up the hills. Ellsworth testified that he could not remember if the boy was ever in a group that did the four-mile loop with him.

The other boy, who was one of Ellsworth's three caseload students with the boy during 1992, testified that he rode the four-mile loop with the boy and Ellsworth, and others, about five times and that the boy was not good at it because he had to stop a lot for breaks. The other boy also testified that he heard the boy tell another Colcord Cottage student that once on a bike trip, the boy told Ellsworth that he needed to use "the favorite tree," meaning he needed to urinate, and that Ellsworth followed the boy into the woods and touched him.

### b. The pond incident.

The boy testified that the second incident occurred at Sandoggerdy Pond. He said that Ellsworth took the other boy and him to the pond to swim. The boy described the pond as having a parking area, little houses around it, and "mucky" water with leaves on the bottom. Both he and the other boy were good swimmers who could put their heads in the water and hold

their breath. On the day of the incident, the boy testified that no other people were at the beach. Ellsworth played in the water with the boy and the other boy. The water was chest deep on Ellsworth. The boy said that Ellsworth told the other boy to swim someplace else, and Steven swam about twenty feet away.

The boy testified that Ellsworth took both of their bathing suits down and began touching the boy's penis under water. The boy told him to stop, but he refused. Then, Ellsworth told the boy to go under water and put his mouth on Ellsworth's penis, which Ellsworth called his "dick." The boy complied because of the threat Ellsworth had made during the biking incident. At first Ellsworth's penis was soft and then it became hard. The boy said that he came up out of the water to get breaths. Ellsworth also touched the boy's penis and his buttocks and that he touched Ellsworth buttocks. The boy felt bad about what he was doing. The boy testified that Ellsworth repeated his threat, and for that reason the boy did not tell anyone.

Ellsworth testified that he took kids swimming at the pond all the time. He said that he usually played in the water with the kids. He denied ever molesting the boy at the pond.

The other boy testified that Sandoggerdy was a smelly pond with dark brown water. He had been there five or six times, and he had been there two times with just the boy and Ellsworth. He said that every time he went there, other people were there, although not necessarily from Spaulding. Both of the times he went to the pond with just the boy and Ellsworth there were approximately fifteen other people on the beach and in the water. He said that Ellsworth and the boy were wrestling in the water and that he was about twenty to twenty-five feet

away from them. the boy would come up behind Ellsworth and yell to scare him and that they were throwing each other around. The other boy said that he saw nothing unusual and nothing of a sexual nature.

### c. The cottage incident.

The third incident occurred when the boy's mother returned him to Spaulding at night on a weekend when he misbehaved at home. The boy testified that when his mother dropped him off at Colcord Cottage, Ellsworth was on duty and the other kids were all asleep. He said that his roommate was away for the weekend, and no other staff person was in the cottage.

The boy testified that Ellsworth came into his room while he was putting on his pajamas and started touching him. He said that Ellsworth took down his own pants and that he put his mouth on Ellsworth's penis, which then got big. The boy described Ellsworth's penis as having hair on it and smelling like pee. He said that he felt bad because he had done it again and that Ellsworth repeated that he would hurt him if he ever told.

Ellsworth testified that most of the students had been abused and that there was a lot of sexual behavior among them so that residential staff had to check on the students in their rooms and their doors had to be open. He testified that he did both the sleepover and wakeover jobs in the cottage during 1992 and explained the process that would occur if a child were returned to the cottage from a home visit due to misbehavior. He denied ever abusing the boy in the cottage or elsewhere.

Another student who was the boy's roommate during the fall of 1992, after Ellsworth left Spaulding, testified that the boy told him that Ellsworth molested him in the cottage in the afternoon during a kid meeting in which Ellsworth was meeting

with him alone. The student said that the boy told him nothing happened at night.

### d. The boy's report of the abuse.

The boy testified that he told his counselor about the abuse because he was thinking about it and could not keep his mind on his work. He said that after he reported the abuse to his counselor in November of 1992, he described the abuse incidents to Chief Leary of the Northfield, New Hampshire police, Mike Nolan of the New Hampshire State Police, and Doug Beaton, from the New Hampshire Division of Children and Youth Services (now Division of Children, Youth, and Families). He also showed the site of the bicycle trip incident to Chief Leary and Doug Beaton. Beaton marked the spot by making slashes on a telephone pole nearby.

In response to questions from the prosecutor, the boy said that he had not heard or seen the videos of his interviews or read anything that anyone had written about the interviews. He said that he had seen the pictures that he drew during the interviews. He said that no one told him what questions would be asked at trial or told him what to say. The prosecution also had the boy draw on diagrams of adult males and male children to show where he touched Ellsworth and where Ellsworth touched him.

### e. Cross-examination.

On cross-examination, defense counsel asked the boy if he had told another student, who had been his roommate, that Ellsworth molested him during a kid meeting at the cottage. The boy said he did not say that, but that his counselor came with him for a cottage meeting in the afternoon when he told a whole group about the incidents. The boy also denied telling another student that the incident on the bike trip occurred when he, the boy, went into the woods to urinate. The boy

admitted that he told Chief Leary that Ellsworth "put his penis in [ the boy's] butt," and that he had not included that in his description of the incident at trial. The boy said that he did not remember it then, but that it did happen. Defense counsel also explored other inconsistencies in the boy's testimony such as whether he told Trooper Nolan that the bike trip occurred during the boy's science class, and the boy denied telling Trooper Nolan such inconsistencies. Defense counsel asked the boy about being taught about good touches and bad touches and discussing those subjects with other students and staff.

### f. Videotapes.

The defense played two videotapes of the boy's statements about the abuse, which were taped on December 17, 1992, and March 18, 1993. The videotapes were shown to the jury but were not transcribed in the trial record. Transcripts were made of those interviews, however, which were included in the in camera materials provided to the court.

Doug Beaton conducted the December 17, 1992, interview. The boy had great difficulty talking about the incidents. When asked about the incident at the pond, he wrote the word "abuse" and then "sexuly." At trial, the boy explained that he did not want to talk about the incidents during that interview because he was afraid.

Trooper Nolan conducted the March 18, 1993, interview. the boy described riding bikes with Ellsworth, after lunch during his science class, on a rocky road and then on a paved road. The boy said that Ellsworth tricked him by stopping and saying that he heard a noise in the woods. Hesitantly, the boy told Trooper Nolan that Ellsworth walked into the woods, that the boy followed, and that Ellsworth pulled down the boy's shorts and took off his own shorts. The boy said that Ellsworth touched him on his penis and buttocks and that he also touched Ellsworth. The boy said that Ellsworth told him to touch Ellsworth's penis.

The boy refused to describe the actions in more detail. Trooper Nolan provided him with diagrams of male adult and child figures and the boy wrote on the diagrams "kissed butt" and "suck dick." With great difficulty, the boy said that he did those things to Ellsworth and that Ellsworth told him to. He said that they then pulled their pants up and returned to Spaulding.

With prompting, the boy next began to describe the incident at Sandoggerdy Pond. He said that he went to the pond with the other boy and Ray and that they were playing and swimming. Then, underwater, Ray took down the boy's suit and began touching him. He said: "[The other boy] was just swimming around having a good old time, didn't know Ray was doing this."

The boy clarified that Ellsworth touched him on his buttocks and his penis and that Ellsworth made the boy touch him. The boy said that when Ellsworth pulled down his own shorts he knew, from the incident in the woods, that Ellsworth meant the boy was to touch him. He said he was underwater when Ellsworth pulled down his pants. The boy said that Ellsworth's penis was hard when he was touching him and got bigger. Afterwards, Ellsworth pulled up his pants and walked out of the pond and that the boy did too. The boy said that Ellsworth told him not to say anything, after the incident in the woods, or he would hurt him, and that Ellsworth repeated the threat at the pond.

The boy said that the third time Ellsworth molested him was when his mother brought him back to Spaulding on a weekend because he was acting up at home. His mother signed him in at the cottage, and Ellsworth was there alone. Ellsworth

came in to the boy's room while he was getting his pajamas on, pulled the boy's bottoms down, and started touching him. The boy said that Ellsworth touched him on his penis and buttocks and made the boy touch Ellsworth on the buttocks and penis with his mouth and his hands. Again, Ellsworth warned the boy not to tell anyone.

At trial, the boy circled parts of diagrams of the figures of an adult male and a male child to show where Ellsworth touched him and where Ellsworth told the boy to touch him. From the trial transcript, it appears that the diagrams the boy drew and wrote on during the March 1993 interview also were admitted into evidence.

### g. Redirect examination.

After the videotapes were played, the prosecutor again examined the boy. The boy said that he had never seen the videotapes before. He said that he was surprised at how much he had grown in two years.

### h. The effect of the error.

The boy's descriptions of the three incidents include remarkably consistent graphic detail. Although other students remember that he told somewhat different versions of the biking incident and the cottage incident, those discrepancies may be misunderstandings and are at most minor. The other boy's perception of what occurred at the pond is consistent with the boy's own description that the other boy did not know what was happening. None of the record evidence contradicts the essential elements of the boy's testimony.

The record does not provide detail about the prior abuse that occurred when the boy was three or four years old.

**[Redacted]**

Given the boy's age at the time of the prior abuse, it is unlikely that his experiences then were the basis for the graphic detail that he provided about his sexual interaction with Ellsworth on three separate occasions. Since the prior abuse occurred under different circumstances, it also does not explain the detail the boy provided about the incidents of abuse by Ellsworth. In other words, the record does not suggest that the boy might have merely described the prior incidents, substituting Ellsworth for the perpetrator. The record also does not suggest a motive for the boy to falsely accuse Ellsworth. The boy testified that he liked Ellsworth until the abuse began. Ellsworth testified that the boy and the two other students in his group behaved well and that he bragged about how lucky he was to have them.

Based on the record as a whole, if the jury had been informed of the boy's prior abuse, their more complete picture of the boy would have been that he had some precocious sexual knowledge and experience. Given the dissimilarities in the experiences, information about the prior abuse would not likely have undermined the boy's graphic descriptions of the three separate incidents of abuse by Ellsworth. In addition, the information about the prior abuse might have suggested to the jury that the boy could have been a ready boy for another sexual predator, who, like Ellsworth, was aware of his history. The court finds that the absence of evidence of the boy's prior sexual abuse did not have a substantial and injurious effect or influence in determining the jury's verdict against Ellsworth. Therefore, the court concludes that the error was harmless.

### B. Denial of Discovery of Evidence Reviewed In Camera

The parties have now had access to certain confidential information, which the state trial court reviewed in camera

before Ellsworth's criminal trial and did not disclose. The materials and information include incident reports pertaining to the Colcord Cottage incident, records of the boy's early sexual abuse and his subsequent treatment, records of the boy's discipline and behavior during 1992, and notes made by the boy's therapist.

■ Ellsworth contends that withholding the confidential information violated his Fourteenth Amendment rights as articulated in *Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). "It is well settled that the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." *Ritchie,* 480 U.S. at 57, 107 S.Ct. 989 (citing *Brady,* 373 U.S. at 87, 83 S.Ct. 1194). Favorable evidence, within the meaning of *Brady,* can be either exculpatory evidence or impeachment evidence. *See United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Evidence is withheld, for purposes of the *Brady* rule, if the evidence was not otherwise known to the defense or available through reasonable diligence. *See Boss v. Pierce,* 263 F.3d 734, 740 (7th Cir.2001); *Coe v. Bell,* 161 F.3d 320, 344 (6th Cir. 1998); *Hoke v. Netherland,* 92 F.3d 1350, 1354 (4th Cir.1996). Except in unusual circumstances, relevant privileged information should be disclosed "when a court of competent jurisdiction determines that the information is 'material' to the defense of the accused." *Ritchie,* 480 U.S. at 58, 107 S.Ct. 989.

*1. Specific defense theories.*

■ The respondents argue that to show the materiality of the withheld information, Ellsworth is limited to the specific defense theories articulated in his motions seeking disclosure of the in camera materials before trial. The respondents are mistaken. While the degree of specificity of a defendant's original request may bear on the materiality of the withheld information, the court's obligation to disclose exculpatory and impeachment information does not depend on a specific request. *Ritchie,* 480 U.S. at 58 n. 15, 107 S.Ct. 989. The obligation is continuing so that "information that may be deemed immaterial upon original examination may become important as the proceedings progress." *Id.* at 60, 107 S.Ct. 989; *see also McCambridge v. Hall,* 266 F.3d 12, 21–22 (1st Cir.2001). Since Ellsworth did not have access to the in camera information, he could not possibly be required to make a specific request and fashion a defense theory based on information he did not know. *See Love v. Johnson,* 57 F.3d 1305, 1313 (4th Cir.1995).

*2. Favorable undisclosed information.*

Ellsworth argues that some of the recently disclosed information was favorable and material to his defense because it undermines the boy's credibility.

**[Redacted]**

*a. Other accusations of sexual assault.*

■ The respondents correctly point out that evidence of other accusations of sexual assault must be false to be probative of a lack of credibility.[7] *See, e.g., Quinn v. Haynes,* 234 F.3d 837, 851 (4th

---

7. The respondents' erroneously argue that disclosure of evidence of false accusations, which would have been used to generally attack the credibility of the defendant's accuser, is not constitutionally mandated under the Fourteenth Amendment. The cases cited by the respondents apply in the context of Sixth Amendment confrontation challenges to limi-

tations on cross-examination, not in the context of Fourteenth Amendment challenges to failure to disclose information under the *Brady* rule. *See, e.g., McMeans v. Brigano,* 228 F.3d 674, 688–89 (6th Cir.2000) (Clay, J. concurring in part and dissenting in part) (discussing different analysis under Fourteenth

Cir.2000); *Grant v. Demskie,* 75 F.Supp.2d 201, 221 (S.D.N.Y.1999).

**[Redacted]**

*b. Information already known or available to the defense.*

The respondents argue that Ellsworth cannot claim that information he knew from other sources or that was cumulative of other evidence in his possession was undisclosed within the meaning of the *Brady* rule. As noted above, failure to disclose information that is already known to the defendant does not constitute a *Brady* rule violation. *See, e.g., United States v. Middlemiss,* 217 F.3d 112, 123 (2d Cir. 2000).

**[Redacted]**

*3. Materiality.*

■ To determine the materiality of favorable undisclosed information, the court considers the collective effect of such information in light of the evidence presented at trial. *See Kyles v. Whitley,* 514 U.S. 419, 421 & 436, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Information is material in this context " 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Ritchie,* 480 U.S. at 57, 107 S.Ct. 989 (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555.

and Sixth Amendments of right to evidence of false accusations).

**8.** Because the undisclosed information about the boy's prior abuse would have been relevant and admissible at trial, contrary to the

**[Redacted]**

Taken as a whole, in the context of the other information known to the defense, that information was not of significant value. As a result, the court's confidence in the guilty verdict, and the fairness of Ellsworth's trial, is not undermined by the absence of the undisclosed information.[8]

*Conclusion*

For the foregoing reasons, the petitioner's motion for summary judgment (document no. 40) is denied. The respondents' motion for summary judgment (document no. 42) is granted.

The petition for a writ of habeas corpus is denied. The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

state courts' rulings, the rule pertaining to materiality of inadmissible evidence does not affect the analysis in this case. *See, e.g., Paradis v. Arave,* 240 F.3d 1169, 1178 (9th Cir. 2001); *see also United States v. Ranney,* 719 F.2d 1183, 1189–90 (1st Cir.1983).